IN THE SUPREME COURT OF THE STATE OF DELAWARE

<table>
<tr><td>THE WILLIAMS COMPANIES, INC.,</td><td>§</td><td></td></tr>
<tr><td></td><td>§</td><td>No. 330, 2016</td></tr>
<tr><td>Plaintiff Below-</td><td>§</td><td></td></tr>
<tr><td>Appellant,</td><td>§</td><td>Court Below: - Court of Chancery</td></tr>
<tr><td></td><td>§</td><td>of the State of Delaware</td></tr>
<tr><td>v.</td><td>§</td><td></td></tr>
<tr><td></td><td>§</td><td>C.A. Nos. 12168 & 12337</td></tr>
<tr><td>ENERGY TRANSFER EQUITY, L.P.,</td><td>§</td><td></td></tr>
<tr><td>et al.,</td><td>§</td><td></td></tr>
<tr><td></td><td>§</td><td></td></tr>
<tr><td>Defendants Below-</td><td>§</td><td></td></tr>
<tr><td>Appellees.</td><td>§</td><td></td></tr>
</table>

Submitted: January 11, 2017
Decided: March 23, 2017

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery: **AFFIRMED**.

Kenneth J. Nachbar, Esquire and Zi-Xiang Shen, Esquire, Morris, Nichols, Arsht & Tunnel LLP, Wilmington, Delaware; Sandra C. Goldstein, Esquire (*argued*), Antony L. Ryan, Esquire, and Kevin J. Orsini, Esquire, Cravath, Swaine & Moore LLP, New York, New York, for Plaintiff Below, Appellant, The Williams Companies, Inc.

Rolin P. Bissell, Esquire, Elena C. Norman, Esquire, Tammy L. Mercer, Esquire, and Benjamin M. Potts, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Michael C. Holmes, Esquire (*argued*), John C. Wander, Esquire, Jennifer B. Poppe, Esquire, Jeremy C. Marwell, Esquire, Andrew E. Jackson, Esquire, Craig E. Zieminski, Esquire, Joshua S. Johnson, Esquire, and Gregory F. Miller, Esquire, Vinson & Elkins LLP, Dallas, Texas, for Defendants Below, Appellees, Energy Transfer Equity, L.P., Energy Transfer Corp LP, ETE Corp GP, LLC, LE GP, LLC, and Energy Transfer Equity GP, LLC.

**VAUGHN**, Justice, for the Majority:

## I.  INTRODUCTION

This appeal arises from a merger agreement under which Energy Transfer Equity, L.P. ("ETE"), a Delaware limited partnership, agreed to acquire the assets of The Williams Companies, Inc., ("Williams"), a Delaware corporation.  Both Williams and ETE are involved in the gas pipeline business.  The Agreement and Plan of Merger (the "Merger Agreement" or "the Agreement") signed by Williams and ETE contemplated two steps.  In the first step, Williams would merge into a new entity, Energy Transfer Corp LP ("ETC"), a Delaware limited partnership taxable as a corporation.  ETE would transfer $6.05 billion in cash to ETC in exchange for 19% of ETC's stock.[1]  The $6.05 billion and 81% of ETC's stock would be distributed to the Williams stockholders in exchange for their Williams stock.  In step two, ETC would transfer the Williams assets to ETE in exchange for newly issued ETE Class E partnership units.  The number of Class E units transferred and ETC shares issued would be the same number and the two were expected to be similar in value.  The result would be that the Williams shareholders

---

[1]  While ETE and ETC are the primary defendants discussed in this opinion, the relationship of the remaining defendants is as follows: ETE Corp GP, LLC is a Delaware limited liability company and the general partner of ETC; LE GP, LLC is a Delaware limited liability company and the general partner of ETE; Energy Transfer Equity GP, LLC is a Delaware limited liability company that, pursuant to the Merger Agreement, would merge with LE GP, LLC and be the surviving entity and general partner of ETE.  Following the merger, ETC was to become the managing member of Energy Transfer Equity GP, LLC.

would receive $6.05 billion plus 81% of ETC's stock, ETE would receive the Williams assets and 19% of ETC's stock, and ETC would own ETE Class E partnership units equal in number to the shares issued by ETC. The merger was conditioned upon the issuance of an opinion by ETE's tax counsel, Latham & Watkins LLP ("Latham"), that the second step of the transaction, the transfer of Williams' assets to ETE in exchange for the Class E partnership units, "should" be a tax-free exchange of a partnership interest for assets under Section 721(a) of the Internal Revenue Code[2] (the "721 opinion"). The Agreement also contained provisions that required the parties to use "commercially reasonable efforts" to obtain the 721 opinion[3] and to use "reasonable best efforts" to consummate the transaction.[4]

After the parties entered into the Agreement, the energy market suffered a severe decline which caused a significant loss in the value of assets of the type held by Williams and ETE. This caused the transaction to become financially undesirable to ETE. It also led to ETE raising an issue as to whether the IRS might view a portion of the $6.05 billion not as payment only for the ETC stock, but as

---

[2] "No gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership." I.R.C. § 721(a).

[3] App. to Appellant's Opening Br. at 680 (Merger Agreement, § 5.07(b)).

[4] *Id*. at 671 (Merger Agreement, § 5.03(a)).

payment in part for the Williams assets, thus rendering the second step of the merger taxable. This issue ultimately led to Latham being unwilling to issue the 721 opinion. Since the 721 opinion was a condition of the transaction, ETE indicated that it would not proceed with the merger.

Williams then sought to enjoin ETE from terminating the Merger Agreement, arguing that ETE breached the Agreement by failing to "use commercially reasonable efforts" to obtain the 721 opinion and "reasonable best efforts" to consummate the transaction. Williams also argued that ETE was estopped from terminating the Agreement by a representation it made in the Agreement that it knew of no facts that would prevent the second step of the transaction from being treated as tax-free at the time the parties entered into the agreement.

The Court of Chancery rejected Williams' arguments. Williams argues on appeal that the Court of Chancery erred by interpreting "commercially reasonable efforts" and "reasonable best efforts" as imposing on ETE only a negative duty not to obstruct performance of the Agreement. The Court should, Williams contends, have interpreted the covenants as creating affirmative obligations on the part of ETE to work to ensure performance of the Agreement. Williams also argues that the Court of Chancery should have recognized that ETE's acts and omissions failed to comply with its affirmative obligations to try to obtain the 721 opinion. Williams

3

further argues that the Court of Chancery erred by placing upon it the burden of proving that ETE's breach of covenants materially contributed to the failure of the closing condition and that it should have shifted that burden to ETE. Finally, it argues that ETE should be estopped from terminating the Agreement because it represented in the Agreement that it did not "know[] of the existence of any fact that would reasonably be expected to prevent [the transaction] from qualifying as an exchange to which Section 721(a) of the Code applies."[5]

In rejecting Williams' arguments, the Court of Chancery concluded that ETE did not breach its covenants. For the reasons which follow, we find that the Court adopted an unduly narrow view of the obligations imposed by the covenants. We also agree with Williams that if a proper analysis of ETE's covenants led to a conclusion that ETE breached those covenants, the burden would shift to ETE to prove that its breaches did not materially contribute to the failure of the closing condition.

The Court of Chancery concluded that Latham's determination that it could not issue the 721 opinion was a good faith determination made by it independent of any conduct by ETE. This finding of fact is not challenged on appeal.[6] Since the

---

[5] *Id.* at 652 (Merger Agreement at § 3.02(n)(i)).

[6] At oral argument, counsel for Williams acknowledged that Williams was not challenging the Court of Chancery's finding that Latham's determination was made in good faith.

facts as found by the Court of Chancery are that ETE's conduct, or lack of conduct, did not contribute to Latham's decision not to issue the 721 opinion, we are satisfied that when the burden of proving that ETE's alleged breach of covenants is properly placed on it, ETE did meet its burden of proving that any alleged breach of covenant did not materially contribute to the failure of the Latham condition.

We also agree with the Court of Chancery's finding that ETE was not estopped from terminating the Agreement. Accordingly, the judgment of the Court of Chancery will be affirmed.

## II. FACTS AND PROCEDURAL HISTORY

Williams, a Delaware corporation, is an energy infrastructure company which owns and operates midstream assets and interstate natural gas pipelines. ETE is a Delaware limited partnership which, along with its family of companies, owns and operates tens of thousands of miles of pipelines which transport natural gas, natural gas liquids, refined products, and crude oil. Williams and ETE entered into the above-described Merger Agreement in September, 2015.

As mentioned, the parties agreed that a condition precedent to the merger was that ETE's tax counsel, Latham, issue an opinion that the second step of the

transaction, ETC's transfer of Williams' assets to ETE in exchange for partnership units of ETE, "should" qualify as tax free under Section 721(a) of the Internal Revenue Code.[7]   Section 721 provides that "[n]o gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership."[8]   In addition to agreeing that the parties would use "commercially reasonable efforts" to obtain this tax opinion,[9] the parties broadly agreed that they would use their "reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable" the merger.[10]   At the time that the parties entered into the Agreement, the parties and their tax advisors all believed that the second step of the transaction would qualify as tax free under § 721(a).

After the energy market went into a severe decline, ETE's publicly traded partnership units dwindled to between a third and half of their value as compared to their value at the time the Agreement was signed, leaving ETE concerned about the

---

[7]  I.R.C. § 721(a).
[8]  *Id.*
[9]  App. to Appellant's Opening Br. at 680 (Merger Agreement § 5.07(b)).
[10]  *Id.* at 671 (Merger Agreement § 5.03(a)).

effect of fulfilling its $6.05 billion cash obligation to ETC.    The parties discussed restructuring or terminating the Agreement, but were unable to reach an alternative arrangement.    The record is quite clear that ETE strongly desired that the transaction not go forward.

ETE explored financing alternatives and ultimately decided to issue a new class of equity units that would reduce its cash distributions in the short term.    ETE pursued a potential public offering of those units. Williams, however, refused to disclose financial information that was required for ETE to complete the necessary filings with the Securities and Exchange Commission.    On March 8, 2016, ETE completed a private offering of convertible units instead.

In March 2016, while evaluating what steps ETE might take to respond to the down turn in the energy market, Brad Whitehurst, ETE's Head of Tax, according to his testimony, discovered an aspect of the second step of the transaction which he had not previously considered.    He testified that he originally thought that the $6.05 billion was to be exchanged for a floating number of ETC shares.    In March, he realized that it was to be exchanged for a fixed number of shares.    Whitehurst then realized that the decline in ETE's unit price caused the 19% of ETC shares, which ETE was to receive in the merger, to be worth substantially less than the $6.05 billion ETE was obligated to pay for those shares.    He testified that the ETC shares which

ETE was to receive would be worth only about $2 billion. He was concerned that the IRS might attribute a portion of the $6.05 billion to the acquisition of the Williams assets, causing the second step in the merger to become a taxable event.

Whitehurst notified ETE's chairman of his concern and on March 29, 2016, Whitehurst contacted Latham and asked it to consider whether the difference in value between the $6.05 billion and the 19% of ETC shares would cause a tax problem. Prior to this, Latham was fully prepared to issue the 721 opinion and had not considered how a change in ETE's unit price would affect its opinion. The attorneys at Latham extensively analyzed the transaction. After consulting with Wachtell, Lipton, Rosen & Katz, ETE's deal counsel, and Vinson & Elkins LLP, ETE's litigation counsel, Latham indicated to ETE that it was likely unable to issue the 721 opinion.

On April 7, 2016, Whitehurst contacted Morgan, Lewis & Bockius ("Morgan Lewis"), ETE's specially retained tax counsel, and asked that firm to analyze the tax consequences of the Merger Agreement, specifically expressing his concern about the decreased value of ETE's partnership units.

On April 11, 2016, Latham informed ETE that it had conclusively determined that it would be unable to issue the 721 opinion as of that date. Latham was concerned that the IRS could attribute the amount by which the $6.05 billion

exceeded the value of the ETC stock to the Williams assets under the disguised sale rules in Section 707 of the Internal Revenue Code. It communicated its position to Cravath, Swaine & Moore LLP ("Cravath"), Williams' tax and deal counsel, the next day.

In the meantime, Morgan Lewis—independent of and without consulting Latham—concluded that it could not issue a 721 opinion if asked. Morgan Lewis was concerned that the IRS might conclude that the parties had specifically allocated the cash to the ETC stock (and not to the Williams assets) for tax purposes, and that the second step was likely taxable as a disguised sale.

Cravath disagreed with Latham's conclusion, but on April 14, 2016 it offered two proposals that it thought would potentially fix the issue with the 721 opinion. Latham reviewed the proposals and determined that neither would result in its issuance of the 721 opinion.

In an April 18, 2016 amendment to ETC's proxy statement, ETE disclosed that Latham had advised that as of that time it would not be able to deliver a 721 opinion.

In late April, Cravath then had Gibson, Dunn & Cruther, LLP, Williams' other deal counsel, review the issue. It ultimately determined that it could give a "weak-should" opinion if asked, but initially acknowledged that it would be difficult to

reach such a conclusion.[11] At the time of the proceedings below, Latham held the position that it would be unable to issue the 721 opinion and anticipated that it would be unable to do so by the closing date.

Williams filed its first complaint against ETE and LE GP, LLC on April 6, 2016, challenging ETE's private offering of convertible partnership units. While the parties were engaged in discovery on that matter, Williams filed its second complaint against ETE, ETE Corp GP, LLC, and Energy Transfer Equity GP, LLC on May 13, 2016, challenging the defendants' actions with regard to obtaining the 721 opinion from Latham. The Court of Chancery ordered that the issues be litigated together and held a trial for both actions on June 20 and 21, 2016. This appeal concerns only Williams' claims regarding the 721 opinion.

In its second complaint, Williams asserted its claims that ETE breached the Agreement by failing to use "commercially reasonable efforts" to obtain the 721 opinion from Latham and "reasonable best efforts" to complete the transaction and, therefore, could not rely on the failure of the 721 opinion condition to terminate the agreement; and that ETE misrepresented that it knew of no facts that would reasonably prevent the second step of the transaction from being treated as tax-free,

---

[11] *Williams Companies, Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682, at *8 (Del. Ch. June 24, 2016).

10

which estopped ETE from terminating the Agreement. Williams sought a declaration that the defendants had committed material breaches of the Agreement and a permanent injunction to enjoin the defendants from terminating the Agreement.

The Court of Chancery began its analysis by deciding whether Latham's conclusion that it could not issue the 721 opinion was made in good faith. It carefully and extensively considered the facts and circumstances surrounding Latham's decision not to issue the 721 opinion. The Court noted that the parties deliberately conditioned the merger on Latham's subjective opinion that the transaction "should" be tax free under § 721(a), meaning that "it is quite likely that the [tax] decision will be upheld."[12]

The Court of Chancery realized that Latham had competing interests with regard to its issuance of the 721 opinion: while Latham's client, ETE, would benefit substantially from its refusal to issue the 721 opinion, Latham also had an interest in maintaining its reputation by delivering an opinion that was consistent with its preliminary assessment from the time that the parties entered into the Agreement. The Court concluded that Latham's ultimate refusal to issue the 721 opinion went

---

[12] *Id.* at *11.

11

against its reputational interests. After reviewing the testimony, the Court found that "Latham took this responsibility [to deliver the 721 opinion] seriously."[13] The Court noted that there were a variety of opinions reached regarding the tax consequences of the transaction which indicated "the closeness of the issue and the unusual nature of the transaction here."[14] The Court came to the conclusion that Latham acted independently and in good faith in determining that it could not issue the 721 opinion. The Court therefore found that as of the date of its opinion, the 721 opinion condition had not been satisfied.

The Court of Chancery next considered Williams' claim that ETE breached its contractual obligation to use commercially reasonable efforts to obtain the 721 opinion. It began by noting that the term "commercially reasonable efforts" was not defined in the Agreement and there is no case law clearly defining the phrase. It then examined the discussion of "reasonable best efforts" which appears in the Court of Chancery case of *Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*[15] The Court found that *Hexion* equated "reasonable best efforts" with good faith, and that "reasonable best efforts" was similar to "commercially reasonable efforts."[16]

---

[13] *Id.* at *13.
[14] *Id.* at *14.
[15] 965 A.2d 715 (Del. Ch. 2008).
[16] *Williams Companies, Inc.*, 2016 WL 3576682, at *16.

12

From this, it concluded that ETE was "bound . . . to do those things objectively reasonable to produce the desired 721 Opinion."[17]

The Court observed that Williams could not point to any commercially reasonable efforts, or objectively reasonable actions, that ETE could have taken to secure the 721 opinion from Latham. The Court also found that Whitehurst did not breach the "commercially reasonable efforts" covenant merely by bringing the § 721 issue to Latham's attention because, as the Vice Chancellor had already determined, Latham made its determination independently and in good faith. The Court also addressed Williams' heavy reliance on the *Hexion*[18] case by distinguishing the case from the facts before him. It noted that in *Hexion*, the company hired an advisor and "knowingly fed the advisor misleading or inaccurate information" to receive an opinion that would allow it to avoid a merger.[19] In the current case, the Court of Chancery observed that the record did not reflect any affirmative acts taken by ETE to mislead Latham and prevent the issuance of the 721 opinion.

Finally, the Court of Chancery addressed Williams' claim that ETE falsely represented that it knew of nothing that would indicate that the 721 opinion could not be issued as of the date the Agreement was signed. It noted that Latham's

---

[17] *Id.*
[18] 965 A.2d 715 (Del. Ch. 2008).
[19] *Williams Companies, Inc.*, 2016 WL 3576682, at *18.

13

analysis was not a "fact" that required disclosure and was instead a theory of tax liability that was not developed at the time of signing the Agreement.[20]   The Court concluded that ETE did not breach its representations and warranties regarding the 721 opinion.

Based on its analysis, the Court of Chancery denied Williams' request to enjoin ETE from terminating the merger based on the failure to obtain the 721 opinion from Latham.   This appeal followed.

## III.   STANDARD OF REVIEW

"We review the Court of Chancery's conclusions of law *de novo* and its factual findings with deference."[21]

## IV.   DISCUSSION

### A.

Williams first claims that the Court of Chancery erred by improperly deciding that ETE did not breach its efforts obligations because it interpreted "commercially reasonable efforts" and "reasonable best efforts" as imposing only a negative duty not to thwart or obstruct performance of the Agreement, rather than   an affirmative duty to help ensure performance.   It argues that the Court of Chancery should have

---

[20]  *Id.* at *19.
[21]  *SV Inv. Partners*, *LLC v. ThoughtWorks, Inc.*, 37 A.3d 205, 209-10 (Del. 2011).

recognized that ETE's acts and omissions constituted a breach of its covenants because those acts and omissions were a failure by ETE to comply with its affirmative obligations to try to obtain the 721 opinion.

Pertinent findings by the Vice Chancellor on this issue are as follows:

> Williams has not pointed to other facts which [ETE] withheld from or misrepresented to Latham *that have caused it to withhold* the 721 Opinion. There is simply nothing that indicates to me that [ETE] has manipulated the knowledge or ability of Latham to render the 721 Opinion, or failed to fully inform Latham, or do anything else, whether or not commercially reasonable, *to obstruct* Latham's issuance of the condition-precedent 721 Opinion, or that had a material effect on Latham's decision. Therefore, I have no basis to find that [ETE] is in material breach of the commercially reasonable efforts requirement.[22]

The Vice Chancellor distinguished *Hexion* from the present case:

> Unlike the record in this case, in *Hexion* the buyer actively and affirmatively torpedoed its ability to finance. If the record here reflected affirmative acts by [ETE] to coerce or mislead Latham, by which actions it prevented the issuance of the [721 Opinion], the facts here would more resemble *Hexion*, and the outcome here would likely be different.[23]

---

[22] *Williams Companies, Inc.*, 2016 WL 3576682, at *17 (emphasis added).
[23] *Id.* at *18.

15

The Court of Chancery in this case took an unduly narrow view of *Hexion*. The buyer in *Hexion* required financing to complete the transaction.[24]   With respect to the financing requirement, the court there observed that "to the extent that an act was both commercially reasonable and advisable to enhance the likelihood of consummation of the financing, the onus was on [the buyer] to *take that act*."[25] After the buyer developed concerns about the solvency of the combined entity, the court in *Hexion* observed that "a reasonable response to such concerns might have been to approach the [seller's] management to discuss the issue and *potential resolutions of it*."[26]   Later, after the buyer consulted with advisors and developed a more substantial solvency concern, the court observed that the buyer "was then clearly obligated to approach [the seller's] management to discuss the appropriate course to take to mitigate" the solvency concerns.[27]   The buyer chose not to approach the seller's management, and the court reasoned "[that] choice alone would be sufficient to find that [the buyer] had knowingly and intentionally breached its covenants under the merger agreement."[28]   *Hexion,* with which we agree,

---

[24] *Hexion*, 965 A.2d at 724.
[25] *Id.* at 749 (emphasis added).
[26] *Id.* (emphasis added).
[27] *Id.* at 750.
[28] *Id.*

16

recognized that covenants like the ones involved here impose obligations to take all reasonable steps to solve problems and consummate the transaction.[29]

Section 5.03 of the Agreement in this case states:

> *[The parties] shall use [their] reasonable best efforts to, and shall cause their respective Affiliates to use reasonable best efforts to, take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper, or advisable to consummate and make effect, in the most expeditious manner practicable, the [merger] . . .[30]*

This language not only prohibited the parties from preventing the merger, but obligated the parties to take all reasonable actions to complete the merger. Section 5.03 also provides that the parties will "us[e] reasonable best efforts to accomplish the following: (i) the *taking of all acts* necessary to cause the conditions to Closing to be satisfied as promptly as practicable."[31]

Section 5.07 states that "[the parties] shall cooperate and each use its commercially reasonable efforts to cause (i) the Merger to qualify for [tax free

---

[29] *See id.* at 755-56. "[The buyer's] utter failure to make any attempt to confer with [the seller] when [the buyer] first became concerned with the potential issue of insolvency, both constitutes a failure to use reasonable best efforts to consummate the merger and shows a lack of good faith." *Id.*

[30] App. to Appellant's Opening Br. at 671 (Merger Agreement § 5.03(a)) (emphasis added).

[31] *Id.* (emphasis added).

17

treatment under Section 721]." [32]    These provisions placed an affirmative obligation on the parties to take all reasonable steps to obtain the 721 opinion and otherwise complete the transaction.    The Court of Chancery erred here by focusing on the absence of any evidence to show that ETE caused Latham to withhold the 721 opinion.

There was evidence, recognized by the Court of Chancery, from which it could have concluded that ETE did breach its covenants, including evidence that ETE "did not direct Latham to engage earlier or more fully with Williams' counsel, failed itself to negotiate the issue directly with Williams, failed to coordinate a response among the various players, went public with the information that Latham had declined to issue the 721 Opinion, and generally did not act like an enthusiastic partner in pursuit of consummation of the [Merger Agreement]." [33]    For the foregoing reasons, the Court of Chancery did not properly analyze whether or not ETE breached its covenants.

**B.**

Williams next contends that, after finding that ETE breached its covenants, the Court of Chancery should have shifted the burden to ETE to prove that its breach

---

[32] *Id.* at 680 (Merger Agreement § 5.07(b)) (emphasis added).
[33] *Williams Companies, Inc.*, 2016 WL 3576682, at *17.

did not materially contribute to the failure of the closing condition. We agree that once a breach of a covenant is established, the burden is on the breaching party to show that the breach did not materially contribute to the failure of the transaction.[34] The plaintiff has no obligation to show what steps the breaching party could have taken to consummate the transaction.[35] To the extent the Vice Chancellor discusses the burden of proof on causation in the text of his opinion, he appears to improperly place that burden upon Williams with comments such as this: "Williams can point to no commercially reasonable efforts that [ETE] could have taken to consummate the [merger]; specifically, in this context, actions available to [ETE] that would have caused Latham, acting in good faith, to issue the 721 Opinion."[36]

This quotation appears in the section of the Court of Chancery's opinion in which it analyzes whether ETE breached its covenants. Since the Court concluded that ETE did not breach its covenants, it did not separately analyze in the text of its opinion whether a breach of covenant materially contributed to the failure of the

---

[34] RESTATEMENT (SECOND) OF CONTRACTS § 245 cmt. B (1981).

[35] *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609 (2d. Cir. 1979). "Plaintiff was not obliged to show just what steps [the defendant] could reasonably have taken" to facilitate the agreement. *Id.* at 614.

[36] *Williams Companies, Inc.*, 2016 WL 3576682, at *16.

transaction. It did, however, acknowledge and address the burden of proof issue

in a footnote:

> Williams appears, in post-trial briefing to argue that the burden is on [*ETE*] to demonstrate a negative – that its lack of more forceful action after discovering the Section 721(a) problem did *not* cause Latham's inability to render the 721 Opinion. Williams cites this Court's decision in *WaveDivision Holdings, LLC v. Millennium Digital Media Sys., LLC* for the proposition that "[i]t is an established principle of contract law that where a party's breach by nonperformance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused," and that "once it has been determined that [a defendant] breached [the contract], the burden of showing that breach did not materially contribute to [failure of the condition] is properly placed on [the defendant]." This is unremarkable; once a plaintiff has demonstrated a breach leading to adverse consequences, it is an affirmative defense that the consequences were otherwise unavoidable. The problem for Williams is that the record is barren of any indication that the action or inaction of the Partnership (other than simply drawing Latham's attention to the problem) contributed materially to Latham's inability to issue the 721 Opinion. This is true regardless of whether [ETE's] actions were commercially reasonable. In other words, no matter how I allocate the burden of proof, the result is the same.[37]

This footnote demonstrates that the Court of Chancery considered the result it

would reach if it found that ETE breached its covenants as alleged by Williams and

---

[37] *Id.* at *16 n.130. (internal citations omitted).

shifted the burden to ETE to show that such breach did not materially contribute to the failure of the 721 opinion condition. The Court finds in its footnote that when so analyzed, ETE met its burden by showing "that the record is barren of any indication that the action or inaction of the Partnership (other than simply drawing Latham's attention to the problem) contributed materially to Latham's inability to issue the 721 Opinion."[38] This determination is based on findings of fact which are not clearly erroneous. For this reason, we have concluded that Williams' argument that the Court of Chancery should be reversed because it improperly placed the burden of proving causation upon it, must fail.

### C.

Finally, Williams claims that ETE is equitably estopped from terminating the Merger Agreement because at the time the agreement was entered into, ETE represented that it did not "know[] of the existence of any fact that would reasonably be expected to prevent [the transaction] from qualifying as an exchange to which Section 721(a) of the Code applies."[39]

> The doctrine of equitable estoppel may be invoked "when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment." To establish estoppel it must be shown that the party claiming estoppel lacked

---

[38] *Id.*

[39] App. to Appellant's Opening Br. at 652 (Merger Agreement § 3.02(n)(i)).

> knowledge or the means of obtaining knowledge of the
> truth of the facts in question; relied on the conduct of the
> party against whom estoppel is claimed; and suffered a
> prejudicial change of position as a result of his reliance.[40]

Williams claims that it relied on ETE's above-quoted representation when it agreed to enter into the particular transaction structure contained within the Merger Agreement, including the 721 opinion condition. Williams contends that when ETE ultimately became concerned about the 721 opinion, the facts and law surrounding the transaction had not changed, and Latham should have considered the possibility that the value of ETE's partnership units could decline when it initially represented that the transaction would qualify as tax free.

However, ETE did not fail to disclose any facts known to it at the time the agreement was signed. What changed was Latham's theory of tax liability. There is nothing in the record to suggest that Latham's ultimate tax theory, which took into account ETE's devalued partnership units, existed at the time the agreement was signed and was withheld from Williams. Williams contends that ETE conveniently pointed out the potential tax issue to Latham as a way to terminate the agreement once it became financially undesirable to ETE. However, the Court of Chancery accepted Whitehurst's testimony that he only realized the potential

---

[40] *Waggoner v. Laster*, 581 A.2d 1127, 1136 (Del. 1990) (quoting *Wilson v. American Ins. Co.*, 209 A.2d 9[02], 903-04 (Del. 1965)) (internal citation omitted).

22

issue when he was considering the tax implications of potential actions for ETE to take in response to the decline in the energy market. Therefore, there is nothing to indicate that ETE knew of this potentially problematic theory of tax liability at the time it made its representations and chose not to disclose it to Williams. At the time ETE entered into the agreement, it desired the consummation of the Merger Agreement and likely would have wanted to address any problem that could result in *either* party terminating the agreement. Therefore, ETE did not breach its representations and warranties and Williams' estoppel argument fails.

## V. CONCLUSION

For the foregoing reasons, the judgment of the Court of Chancery is affirmed. The time for filing a motion for reargument is shortened to seven days.[41]

---

[41] Supr. Ct. R. 18.

23

**STRINE**, Chief Justice, dissenting:

The world can look much different depending on the lens through which you view it. That is certainly the case when you are a judge or a jury. And the lens that a judge uses when he determines whether a party has breached a contract and caused harm is supposed to influence how he assesses the evidence before him. In the parlance of judges, the terms "burden of proof" and "standard of review" refer to the pair of glasses you wear to decide a case.

In this case, there is no doubt that the Court of Chancery acted with its historic diligence in addressing expedited litigation involving a huge record with rapid speed and issuing a thoughtful, careful decision. My friends in the Majority affirm the outcome of that decision, even though they concede that the Court of Chancery did not view the case through the appropriate lens.[42] The Court of Chancery's decision focuses intently on one issue, whether the person I will call the "Latham Tax Lawyer" was honest when he said he could not give the required tax opinion. But, that was not the relevant issue. The fact that the Latham Tax Lawyer did not give the required tax opinion was not contested. If it had been the central issue, there would not have been a case. The question was why the Latham Tax Lawyer did not

---

[42] Majority Op. at 18.

give the required opinion, and that was not a question centrally dependent on his state of mind, as if he was the defendant in a fraud trial.

The Majority admits that the Court of Chancery did not analyze that question of why the Latham Tax Lawyer did not give the required opinion in the appropriate manner.[43] The need for the opinion came about when an oil and natural gas pipeline operator, ETE, agreed to buy another pipeline operator, Williams. They signed a merger agreement on September 28, 2015. Like the Majority, I refer to that agreement as the "Merger Agreement." I also use "721 opinion" the way the Majority does, to refer to an opinion by the Latham Tax Lawyer, required by the Merger Agreement as a condition to closing, that the transfer of Williams' assets in exchange for partnership units "should" be a tax-free exchange under Section 721(a) of the Internal Revenue Code.

The Merger Agreement imposed a specific duty on ETE in connection with the 721 opinion, which was to use "commercially reasonable" efforts to obtain the opinion.[44] That is an affirmative covenant and a comparatively strong one.[45]

---

[43] *Id.*

[44] App. to Appellant's Opening Br. at 680 (Merger Agreement, § 5.07(b)). The Majority also rightly notes that ETE was obligated to use "reasonable best efforts" to consummate the transaction as a whole. *Id*. at 671 (Merger Agreement, § 5.03(a)).

[45] *See* LOU R. KLING & EILEEN T. NUGENT, NEGOTIATED ACQUISITIONS OF COMPANIES, SUBSIDIARIES AND DIVISIONS § 13.06 (2001) (observing that "best efforts" standards can potentially lead to the party making the promise having to take extreme measures to fulfill it and

25

Instead of determining whether ETE in fact used commercially reasonable efforts to obtain the 721 opinion, the Court of Chancery focused on whether ETE had somehow prevented the Latham Tax Lawyer from giving the 721 opinion,[46] and concluded that, although ETE had certainly not desired the 721 opinion because it wished to get out of the deal, ETE had not coerced or misled Latham to prevent the issuance of that opinion.[47]

The Court of Chancery, applying an understandable reluctance to call the Latham Tax Lawyer dishonest or a bad man, accepted his testimony, that he just could not get to the point where he could give the opinion.[48] That was so even in a context where Latham had indicated at the time the Merger Agreement was signed—indeed for the six months up until the moment ETE contacted it—that it was ready, based on what it knew, to give the required 721 opinion.[49] That in a context where the most central consideration terms in the Merger Agreement used an exchange ratio trading a fixed amount of cash for a fixed amount of stock—stock that tracked

that "commercially reasonable efforts" is a strong, but slightly more limited, alternative).

[46] *E.g.*, *Williams Companies, Inc.*, 2016 WL 3576682, at *18 ("Unlike the record in this case, in *Hexion* the buyer actively and affirmatively torpedoed its ability to finance. If the record here reflected affirmative acts by [ETE] to coerce or mislead Latham, by which actions it prevent issuance of the 721 Opinion . . . the outcome here would likely be different.").

[47] *Id.* at *18.

[48] *Id.* at *15.

[49] *Id.* at *7.

the performance of ETE, the value of which could obviously move based on evolving economic conditions, including the market's assessment of the transaction itself. The consideration portion of a definitive acquisition agreement like the Merger Agreement here is about as fundamental as it gets,[50] and Latham never claimed not to know the amount of shares to be exchanged for cash was fixed. And the public disclosures of the deal described this structure.[51] As the Majority[52] and the Court of Chancery[53] acknowledge, ETE itself also represented and warranted that it knew of nothing that would prevent Latham from issuing the 721 opinion.[54] Fairly read, this means that ETE had no reason to believe that the structure of the deal's exchange provisions would give rise to a challenge to its tax-free treatment. So, if, as ultimately happened, the Latham Tax Lawyer was unable to issue the 721 opinion based on his post-signing recognition of facts known pre-signing, a

---

[50] JAMES C. FREUND, ANATOMY OF A MERGER: STRATEGIES & TECHNIQUES FOR NEGOTIATING CORPORATE ACQUISITIONS 56 (1975) ("[T]he subject of purchase price [is] obviously the single most important aspect of any acquisition transaction."); *id*. at 175 ("In spite of all the legalistic paraphernalia of modern acquisitions . . . the purchase price remains the most venerable indicium of a gratifying deal."); KLING & NUGENT, *supra* note 45, at § 1.01 (describing price and form of consideration as two of the "threshold questions" of an acquisition); *id*. at § 1.05[1] (describing the terms of a merger agreement specifying price and form of consideration as potentially "the most important in the entire agreement").

[51] Appellees' App. to Answering Br. at B0020-22 (Form 8-K/A, the Williams Companies, Inc. with corrected Merger Agreement, Oct. 1, 2015).

[52] Majority Op. at 21.

[53] *Williams Companies, Inc.*, 2016 WL 3576682, at *6.

[54] App. to Appellant's Opening Br. at A636-37 (Agreement and Plan of Merger, dated Sept. 28, 2015 § 3.01(n)(i)).

27

condition would have failed, quite unexpectedly and with more than the whiff of either a lack of care or less innocent causal factors, including improper client pressure. Stuff like this happens in complex mergers. But, what also typically happens then is that both parties work together to resolve those problems in good faith. If one party does not, and that party also committed to a particular level of effort to fulfill such conditions, that may constitute a covenant breach.

As the Majority notes, under our law if a party establishes a breach of a covenant to bring about a condition at closing, the burden is on the breaching party to show that the breach did not materially contribute to the failure of that closing condition. [55] In this context, where the Merger Agreement's "commercially reasonable efforts" term obligated ETE to take affirmative steps to make sure the 721 opinion condition was satisfied and, instead, ETE did not, ETE must then prove that the 721 opinion condition would not have been satisfied had it acted appropriately.[56] In lieu of applying this framework, the Court of Chancery focused

---

[55] Majority Op. at 18-19.

[56] *WaveDivision Holdings, LLC v. Millennium Digital Media Systems, L.L.C.*, 2010 WL 3706624, at *15 (Del. Ch. Sept. 17, 2010) (breaching party required to demonstrate that breach did not materially contribute to failure of condition); *Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*, 965 A.2d 715, 755 (Del. Ch. 2008) (placing burden on breaching party to show "that there were no viable options it could exercise to allow it to perform without disastrous financial consequences"); *see also Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 614 (2d Cir. 1979) (shifting burden to breaching party to "prove there was nothing significant it could have done to [fulfill its contractual commitment] that would not have been financially disastrous"); RESTATEMENT (SECOND) OF CONTRACTS 245 cmt. b ("[I]f it can be shown that the condition would

28

on whether the Latham Tax Lawyer was honest in saying he could not give the 721 opinion. Admittedly, the Court of Chancery opinion contained a cursory paragraph, consigned to a footnote, that said the record was "barren of any indication" that ETE's action or inaction materially contributed to the Latham Tax Lawyer's inability to issue the 721 opinion.[57]

But, I do not believe that the footnote saying that if the Court of Chancery had properly placed this burden on ETE, then the case would have come out the same way, is a substitute for a proper analysis.[58] The Latham Tax Lawyer was put in an extremely awkward position by the manner in which the potential 721 opinion issue was flagged by ETE itself and by ETE's conduct after it asked the Latham Tax Lawyer to rethink his position based on his client's musings. By the time of trial, ETE had put the Latham Tax Lawyer as far out on a professional tree limb as it could without causing him to literally plummet to earth. But, this behavior of ETE and its effect on the non-satisfaction of the condition was not viewed through the gimlet-eyed lens that the appropriate standard of review required, one that required ETE to prove that its own breaching conduct did not materially contribute to the Latham

---

not have occurred regardless of the lack of cooperation, the failure of performance did not contribute materially to its non-occurrence and the rule does not apply. *The burden of showing this is properly thrown on the party in breach*." (emphasis added)).

[57] *Williams Companies, Inc.*, 2016 WL 3576682, at *16 n.130.

[58] *Id.*

29

Tax Lawyer's inability to deliver the 721 opinion.

ETE's suspicious behavior really only got going several months after ETE and Williams signed the deal, after the energy markets in which they both participate materially deteriorated.[59] This market decline meant both ETE and Williams were worth less. For ETE that raised concerns about its capacity to take on additional debt to finance the cash component of the merger,[60] and some at ETE also believed that Williams was more exposed to the downturn than ETE, thus also decreasing the value of what ETE was buying.[61] Crucially, this also meant that, although at the time the Merger Agreement was signed, ETE was paying about $6 billion in cash in exchange for ETC stock worth roughly $6 billion, the ETC stock, which tracked ETE's market value, had declined to around $2 billion. Yet, because the amount of stock and the dollar amount were both fixed, the exchange became unequal with ETE giving, by some estimates, $4 billion more in cash than it was receiving in the current value of ETC stock.[62]

By January, ETE's chairman's preferred solution was terminating the Merger

---

[59] *Id.* at *4.
[60] *Id.*
[61] App. to Appellant's Opening Br. at A2599-600 (Plaintiff's Corrected Opening Pretrial Br., dated June 16, 2016).
[62] *Williams Companies, Inc.*, 2016 WL 3576682, at *6.

Agreement because of this economic deterioration.[63]  Then, in late March, the Latham Tax Lawyer received an unexpected call from Brad Whitehurst. Whitehurst was ETE's senior executive in charge of tax matters, among other things. The call was unexpected in the sense that in the six months from signing up until Whitehurst had what the Court of Chancery termed his "epiphany,"[64] Whitehurst had never before raised a concern about the structure of the exchange.  But, Whitehurst's epiphany was that he supposedly had believed that the number of ETC shares, i.e., stock tracking ETE's performance, exchanged for cash would float based on their value, rather than the reality that both the cash consideration and number of shares were fixed.[65]  Whitehurst was supposedly concerned that, because the value of the ETC shares had declined materially due to economic conditions, the cash (still $6 billion) and the value of the shares (down from $6 billion to $2 billion) no longer matched.  Thus, on Whitehurst's logic, the IRS might apply the "excess" $4 billion to the leg of the transaction where ETC contributed Williams' assets to ETE in

---

[63] *Id.* at *4.

[64] *Id.* at *12. Epiphany is an odd word for this spiritual revelation.  Put aside the more general concern about combining the sacred and the profane, Whitehurst's epiphany did not inspire him to selflessly give away his wealth and stock to devoting his life to helping the poor and lost come to righteousness.  His epiphany involved conjuring up a reason his employer could avoid buying a company it once dearly desired and instead forsaking that partner.  Less an epiphany, then, and more like if Fezziwig had been visited by Marley and urged to change his ways and become like pre-reform Scrooge!

[65] *Williams Companies, Inc.*, 2016 WL 3576682, at *6.

exchange for ETE units, triggering a taxable gain.[66]

Whitehurst then communicated this concern with the Latham Tax Lawyer on March 29, 2016 triggering a review by Latham of whether it could give the opinion. Absent Whitehurst's epiphany that required Latham to dig into this new issue, no evidence in the record suggests that Latham would not have simply proceeded to give the opinion it had always intended to give.[67] Indeed, at the time, as the Court of Chancery found, "no one else shared [Whitehurst's] view."[68] Whitehurst testified that, despite ample opportunities to do so, including reviewing drafts of deal documents describing the exchange ratio, he hadn't understood that the amount of stock was fixed.[69] Williams, unsurprisingly, contested the innocence of this epiphany.

Unlike the Majority, I see no part of the Court of Chancery's decision where it accepted Whitehurst's story that he only realized that the amount of stock was fixed six months after the agreement was signed. Rather than deciding whether Whitehurst was telling the truth, the Court of Chancery just punted, assuming that it

---

[66] *Id.*

[67] *Id.* at *7 ("Before its conversation with Whitehurst, Latham was preparing to issue the 721 Opinion and had *never considered* that it would be unable to issue it." (emphasis added)).

[68] *Id.* at *6.

[69] *Id.* at *7.

32

was not material to the ultimate issue.[70]   Indeed, that punt illustrates the importance of using the correct lens and the inadequacy of the Court of Chancery's footnote because, to my mind, it matters very much in determining whether ETE met its burden to assess whether Whitehurst, a primary operative for ETE on this transaction, was telling the truth when he said that he, the Executive Vice President and Head of Tax of a publicly traded partnership that was a routine dealmaker, was not aware that the value of only one side of a critical part of the merger consideration floated with the valuation of ETE's business and was thus subject to the vagaries of the market price of oil and gas.   If one does not believe that rather improbable claim, it colors everything that Whitehurst says he did or didn't do and of conduct in the record that he cannot disclaim.[71]

---

[70] The Vice Chancellor noted "I do not need to resolve the issue of Whitehurst's motivation" when dealing with Latham's analysis, *id.* at *12, and that the question of if Whitehurst's call to Latham was "a veiled suggestion" that Latham assist ETE in avoiding the transaction was "an issue on which I need not opine," *id.* at *17.   Indeed, the Vice Chancellor seemed to even express some skepticism when he referred to "Whitehurst's epiphany, if such it was."   *Id.* at *12.

[71] I respectfully disagree with my friends in the Majority on one key, related point.   The Majority says that Williams does not challenge that Latham's "determination that it could not issue the 721 opinion was a good faith determination made by it *independent of any conduct by ETE.*"   *Id.* at 4 (emphasis added).   Although I agree that Williams does not challenge on appeal the Court of Chancery's finding that Latham acted in good faith in declining to give the 721 opinion, I do not agree that Williams did not challenge the Court of Chancery's terse conclusion that Latham's failure to issue the opinion was not influenced by the conduct of ETE and, in particular, Whitehurst.   In fact, the central focus of Williams' appellate argument is that the Court of Chancery failed to apply the appropriate prism on that question, and that it erred because it should have required ETE to show that the 721 opinion condition would not have been satisfied had it acted appropriately.   *See, e.g.,* Appellant's Opening Br. at 23 ("Following Delaware law, the Court of Chancery should have . . . [required] ETE to prove that [its] acts and omissions did not

Lawyers by nature tend to be loyal to their clients. This is sort of baked into our professional rules.[72] When Whitehurst told the Latham Tax Lawyer his concerns, it was rather obvious that ETE did not wish to go through with the deal. If somehow a condition excused closing, that would have made ETE ecstatic. When Whitehurst therefore started musing about the potential tax law implications of a provision in the agreement that is kind of hard not to know about, it is difficult to imagine that he was not putting implicit, but undeniably extant, pressure on the Latham Tax Lawyer to have doubts about whether he could give the opinion. Now, of course, ETE argues that this pressure was just of a legitimate legal nature, in the sense of raising, in an innocent way, a potential legal problem to be solved.

To assess if this were so, one would of course wish to consider whether Whitehurst was credible in claiming that by gosh, the part-fixed, part-floating nature

---

materially contribute to the failure of the closing condition."); *id*. at 28 ("ETE's secrecy, its refusal to permit Latham to engage with Cravath, its decision to box Latham in by quickly publishing Latham's views, its refusal to explore potential solutions to Latham's concerns, its failure to explore Williams' proposed fixes or to ask its tax advisors to try to come up with their own and, generally, its decision to place its own economic interest in terminating the Transaction ahead of its contractual commitments all plainly breached ETE's efforts obligations."); *id*. at 36 ("We simply do not know how Latham ultimately would have resolved the issues if, contrary to fact, ETE had engaged meaningfully with Williams and otherwise complied with its efforts obligations.").

[72] *E.g.*, Del. Lawyers' Rules of Prof. Conduct R. 1.3 cmt. 1 ("A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor. A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf.").

34

of the exchange just occurred to him when his employer no longer wished to do the deal, and he had just became curious about its tax implications then. And that all of this was true even though a core part of Whitehurst's title suggests he was supposed to think about the implications of the exchange ratio and the tax eligibility of the deal before ETE signed the agreement. And, it is not as though Whitehurst came off the back of the proverbial vegetable truck. Before ETE, he had a long tax career[73] and no doubt saw the effects of more than one boom and bust cycle in the oil and gas industry. If his testimony that he did not know about the ratio until six months after the deal was signed was not credible, Whitehurst's legal curiosity would tend to look like an attempt to influence the Latham Tax Lawyer not to give the 721 opinion and it would also tend to suggest his communication with the Latham Tax Lawyer conveyed client pressure to get to no. Given that ETE, and by extension, Whitehurst, had exactly the opposite duty—to act in a commercially reasonable fashion to obtain the 721 opinion[74]—this would be extremely problematic.

Compounding this curious beginning is how Whitehurst and the Latham Tax

---

[73] App. to Appellant's Opening Br. at A2817 (Trial Tr., Vol. 1, dated June 20, 2016, Bradford Whitehurst).

[74] *See* Majority Op. at 17 ("These provisions placed an affirmative obligation on the parties to take all reasonable steps to obtain the 721 opinion and otherwise complete the transaction.").

35

Lawyer, and therefore ETE, approached its compliance with the covenant to act in a commercially reasonable fashion. The Majority seems to suggest that ETE encouraged the Latham Tax Lawyer to come to the table with its transactional counsel, Wachtell, and try to brainstorm about the tax issue and solve it.[75] That is in fact the opposite of what the record suggests happened. When Wachtell was approached by the Latham Tax Lawyer about the tax issue—nine days after the issue was originally raised, a lifetime by deal standards—Wachtell's reaction was that there was no issue.[76] Thus, Wachtell was well positioned to help ETE satisfy its contractual duties by working with Latham to get to the point where the required opinion could be given. Instead of encouraging this type of cooperation and making absolutely clear to Latham that ETE wanted it to get to yes and to be supple and open-minded about noodling with others about the issue, ETE did the opposite and at no point was Wachtell asked to assist with the analysis. Rather, the record suggests ETE took steps to keep Wachtell away from collaboration with Latham to get to yes.[77] Likewise, when ETE hired other tax lawyers, at Morgan Lewis, to consult on the issue, it did not ask them to get in a room with Latham and Wachtell

---

[75] *Id.* at 8.

[76] App. to Appellant's Opening Br. at A907 (Handwritten notes of April 7, 2016 conference call (JX132)).

[77] *Id.* at A2865 (Trial Tr., Vol. 1, dated June 20, 2016, Alison Preiss Video Clips).

and figure out a way to get to yes.[78]   In fact, ETE told Morgan Lewis that they were

not to talk to Latham.[79]

Even more important, Whitehurst and Latham kept the other side of the

transaction in the dark for a commercially unreasonable and thus highly suspect

period of time.   It was a full two weeks after Whitehurst contacted the Latham Tax

Lawyer, before Latham informed Williams' counsel, Cravath, that they were not in

a position to deliver the 721 opinion.   This was the first time that Cravath, or, it

appears, any of Williams' advisors or staff, had heard of the problem and it was only

once the Latham Tax Lawyer had come to a firm conclusion.   Then, a mere six days

later, ETE filed an amended proxy statement that publicly disclosed Latham's

position that it would not deliver the 721 opinion, in Whitehurst's words

"poison[ing] the well."[80]   There was no reason to amend the disclosure so urgently

nor is it obviously the case that Latham's view necessarily had to be included at the

time.[81]

---

[78] A Cravath partner testified that a Wachtell partner told him that Wachtell "was not permitted by" ETE to speak with Morgan Lewis.   *Id*. at A2800 (Trial Tr., Vol. 1, dated June 20, 2016, Minh Van Ngo).

[79] *Id.* at A2930 (Trial Tr., Vol. 2, dated June 21, 2016, William McKee).

[80] *Id*. at A2433 (Deposition of Brad Whitehurst taken on June 13, 2016).

[81] In fact, Cravath objected to including the disclosure—unsurprising because they had not heard back from Latham on their proposed fixes, much less on their position that the issue was, in fact, a nonissue.   *Id.*

Under the circumstances, disclosing Latham's position easily could be read as another tactic by ETE to pin the Latham Tax Lawyer down. In human terms, by issuing a public statement that Latham could not deliver the 721 opinion, ETE put the Latham Tax Lawyer in a position of having to publicly move off its previous position after the world had been told what that was. It does not take much experience with human nature to realize how much more difficult it is to get someone—say a judge—to reverse herself after making a ruling than it is to get that person to remain open to multiple possibilities in advance of a ruling. Anyone who consults statistics about the success rate of reargument motions would be convinced of this obvious human reality. That reality must be taken into account with the stark numbers: ETE concealed the issue from Williams for fourteen days, but took barely six days to try to work the issue out with them.

Somewhat trampled in ETE's rush to file the good news were Cravath's proposals for addressing Latham's concerns, which they delivered to Latham only two days after hearing of the concerns for the first time. Latham didn't get back to Cravath on those proposals until well after the proxy was filed, fifteen days after Cravath proposed them. Of course, we know Latham's answer was that neither proposal was workable, although there was testimony that some at Latham believed

38

at least one proposal would help and that there was concern it "helps enough."[82]

Morgan Lewis also seemed to think that one of Cravath's proposals might work.[83]

But, by this time, Latham was in the public Klieg lights, its client ETE clearly did

not wish to get to yes, and Whitehurst was not arguing that everyone get in a room

and solve the problem. Rather, the Court of Chancery's fact finding suggests the

conversation was rather one way: "Latham conveyed its conclusion on the

proposed modifications to both Williams and Cravath."[84] So, these suggestions,

which in a more collaborative environment shaped by good faith on the part of ETE

might have provided a complete solution, instead were given little consideration.

The failure to get to yes is all the more questionable because of the number of

people who seemed to think Whitehurst's theory was, at best, strained. Initially, no

one on either side shared Whitehurst's view or that of the Latham Tax Lawyer who

adopted it.[85] Lawyers from both Cravath and Wachtell thought there was either no

issue or potential solutions to the issue Whitehurst identified. Williams' expert,

Professor Howard Abrams, testified no reasonable tax attorney would refuse to issue

---

[82] *Id.* at A928 (Email chain re: McKee & Structure Changes, dated Apr. 15, 2016 (JX151)).
[83] *Id.* at A1028 (Email chain re: Notes from Latham call, with attachment, dated May 23, 2016 (JX534)).
[84] *Williams Companies, Inc.*, 2016 WL 3576682, at *8.
[85] *Id.* at *6.

the 721 opinion,[86] and, indeed, ETE's own experts, Abraham Shashy and Professor Ethan Yale,[87] didn't buy into the Latham Tax Lawyer's theory—they had their own reasons for warning the transaction risked not receiving tax-free treatment,[88] and those experts conceded that changing certain questionable factual assumptions provided to them by ETE might reverse their conclusion entirely.[89]

Like the Court of Chancery, this recitation of the record leaves me sympathetic with the Latham Tax Lawyer when he said he could not get to yes. But, unlike the Court of Chancery, this record suggests to me the need for a view of the evidence through the right lens, not to exculpate the very conduct that put Latham

---

[86] *Id.* at *14. Professor Abrams is the Warren Distinguished Professor and director of the tax program at University of San Diego Law School. App. to Appellant's Opening Br. at A2891 (Trial Tr., Vol. 2, dated June 21, 2016, Howard Abrams).

[87] Abraham N. M. Shashy, Jr. is the Tax Practice Group Leader at the law firm King & Spalding LLP, *id.* at A1840-41 (Expert Affidavit of Abraham N. M. Shashy, Jr., dated June 3, 2016 (JX572)), and Professor Ethan Yale is a Professor of Law at the University of Virginia School of Law, *id.* at A1890 (Expert Affidavit of Professor Ethan Yale, dated June 3, 2016 (JX573)).

[88] *Id.* at A1870 (Expert Affidavit of Abraham N. M. Shashy, Jr., dated June 3, 2016 (JX572)) (stating that "the risk is substantial" that the transaction would not receive tax-free treatment); *id.* at A1911 (Expert Affidavit of Professor Ethan Yale, dated June 3, 2016 (JX573)) (stating "there is serious doubt" that the transaction would receive tax-free treatment).

[89] *Id.* at A2244 (Deposition of Abraham N.M. Shashy, Jr. taken on June 11, 2016); *id.* at A2926 (Trial Tr., Vol. 2, dated June 21, 2016, Ethan Yale). The crux of the issue was that ETE told the tax experts that there was no non-tax motive for the transfer of ETC shares to ETE, *e.g.*, *id.* at A2230 (Deposition of Abraham N.M. Shashy, Jr. taken on June 11, 2016), but, Williams argues that the Court of Chancery's finding that another reason for the transfer was that "it aligned interests between [ETE] and ETC" so that "[a]ctions taken by [ETE after the consummation of the merger], therefore, would likely be consistent with the interests of ETC and its stockholders as well," *Williams Companies, Inc.*, 2016 WL 3576682, at *13, suggests ETE's provided assumption was inaccurate, and, thus, ETE's experts would likely have come to a different view with a more accurate picture of the transaction.

in such an awkward position. In other words, the Court of Chancery's sympathy toward the Latham Tax Lawyer had the effect of ignoring the covenant-breaching behavior that put the Latham Tax Lawyer under undue professional pressure in the first place. The multiple forms of behavior that breached ETE's affirmative obligation are exactly the kind of conduct that compromised the ability of the Latham Tax Lawyer to find a way to yes, and that foreclosed any meaningful consideration of economically immaterial adjustments to the transaction that might have solved any genuine tax concern.

As to this, there is, of course, a final irony. Adjusting the manner in which the agreed-upon consideration would pass, by a modest amendment of the merger agreement, would have had no material economic effect on ETE from the terms of the deal it clearly struck. That this would have simply required ETE to amend a provision that the tax lawyer, Whitehurst, who was central to its contractually improper behavior claimed he did not know about and that was the "inspiration" for his tax concerns has a metallic taste to it, because if Whitehurst did not consider those provisions important enough to understand, the modest amendment required to fix the problem certainly would not have undermined any contractual expectation central to ETE's decision to bind itself to buy Williams.

The Court of Chancery was of course right that "even a desperate man can be

an honest winner of the lottery."[90] But under settled contract law, when, in desperation, you breach your obligation to help a condition come about, you do not get credit for rigging the game. For these reasons, I would remand and require a new trial at which ETE would be required to prove that its breach did not materially contribute to the failure of the Latham Tax Lawyer to deliver the 721 opinion.

---

[90] *Williams Companies, Inc.*, 2016 WL 3576682, at *2.